### In re PUSEY & JONES CO. (two cases). *

(Circuit Court of Appeals, Second Circuit. November 20, 1922.)

#### Nos. 46, 47.

Bankruptcy ⊙⇒16—"Principal place of business" of bankrupt corporation held not in district.

Under Bankruptcy Act, § 2 (1), being Comp. St. § 9586, conferring jurisdiction to adjudicate persons bankrupt who have had their "principal place of business" within the court's jurisdiction for the preceding six months or greater portion thereof, a shipbuilding corporation doing business in Delaware *held* not to have had its principal place of business in New York City, although the owner of practically all its stock lived there, and during a part of the six months' litigation or negotiation activities were carried on in behalf of the corporation, but the business for which the corporation was organized and functioned was continuously carried on in Wilmington.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Principal Place of Business.]

Manton, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Southern District of New York.

In the matter of the Pusey & Jones Company, bankrupt. Voluntary petition in bankruptcy, and also involuntary petition of George F. Pawling & Co. and others for adjudication of the same company. From an order confirming, with one modification, the report of a special master, recommending the dismissal of both involuntary and voluntary proceedings for want of jurisdiction, the bankrupt and creditors appeal. Affirmed.

The question litigated was whether or not the principal place of business of the Pusey & Jones Company, under section 2 (1) of the Bankruptcy Act (Comp. St. § 9586), was in the Southern district of New York. An involun-

tary petition in bankruptcy was filed against this corporation on July 19, 1921, and the company filed an answer, admitting the allegations of the petition, and adjudication was had on July 19, 1921, and receivers were appointed. Notwithstanding this adjudication, a voluntary petition was filed by the company on July 23, 1921, and an adjudication was had on the same day.

On June 9, 1921, the United States District Court for the District of Delaware had appointed receivers for the same company, and these receivers took appropriate proceedings to resist the adjudication of the Southern district of New York on the ground that the court had no jurisdiction. The subject-matter of the controversy was referred to Walter C. Noyes as special master, and after an elaborate inquiry he filed his report, holding that the principal place of business of the company for the period of six months preceding the two bankruptcy proceedings was in Wilmington, in the state of Delaware, and not in the. Southern district of New York, and recommending that the adjudication in bankruptcy made in the Southern district be set aside and that the proceedings be dismissed. This report received careful consideration by the District Court, which agreed fully with the conclusions reached and the reasons stated therefor by the special master, except that the court sustained the exception to the special master's refusal to find the proposed finding of fact No. 62. It is the order entered after this decision by the District Court that is now here on appeal.

The report of the special master covers so fully and accurately the essential features of the testimony, as well as the antecedent history of the Pusey & Jones Company, that it will be conducive to brevity in the long run and to clear understanding of the facts to set forth the report, together with the request to find No. 62.

Request No. 62, which should be read with the report, is as follows:

"(62) The duties of Mr. Coxe, as vice president and general manager, were confined to operating the plants. The finances of the corporation were entirely out of his hands, and he had nothing to do with them, nor had he anything to do with employing sales managers or treasurers of the company, or discharging them."

Omitting formal preliminaries, the report of the special master is as follows:

"In order to enable the parties to present fully the questions of law to the court from their different points of view, I have made findings of fact and have numbered them separately. As I view the case, some of these findings have very remote bearing upon the real questions in issue. But they have been requested, and it has seemed desirable to include them.

"Following the numbered findings, I shall discuss the issues, and will undoubtedly make statements of fact in addition to those contained in the findings. Such statements are to be regarded as my findings of fact to the same extent as if they were included among the numbered findings. The following facts are found:

"(1) The Pusey & Jones Company (the original corporation) was organized in 1879 under a special act of the state of Delaware for the purpose, generally, of building steam and sail vessels and of manufacturing engines, boilers, and machinery. From the time of its incorporation up to 1917, when it consolidated with other corporations as hereinafter stated, it carried on a business of a twofold character at Wilmington, Del., operating on the one hand a shipyard and on the other a plant for the manufacture of sugar-making and paper-making machinery. It had no other plant. The corporation took out a license to do business in New York in 1896, but nothing appears as to the extent of the business carried on here, nor as to how long it continued. In 1917, the secretary of the corporation drafted an instrument canceling the New York license and sent it to Wilmington for execution, stating that, as the corporation was not doing business in New York, it ought to take such step in order to avoid possible taxation. The revocation, however, was not filed.

"(2) The charter of the Pusey & Jones Company was amended in 1915 and the amended certificate of incorporation provided that "the location of its principal office in the state of Delaware" should be in the city of Wilmington. Other clauses of the certificate provided for the publication of notices concerning the redemption of preferred stock in Wilmington newspapers and for

deposits in connection with such matter in a Wilmington Trust Company. The certificate also provided that the corporation might 'have one or more offices in addition to the principal office in Delaware.' In 1917, the charter of said corporation was again amended, and the amended certificate contained provisions as to publication and deposit similar to those stated. This amount increased the authorized capital stock of the corporation from $1,200,000 to $20,000,000.

"(3) About March, 1916, Christoffer Hannevig purchased practically all the outstanding stock of the Pusey & Jones Company. Early in 1917, said Hannevig also acquired the stock of the New Jersey Shipbuilding Company, which had its only plant at Gloucester, N. J. This was a Delaware corporation, but its business activities were all in New Jersey. Early in 1917, said Hannevig likewise acquired the stock of the Pennsylvania Shipbuilding Company, which also had its only plant at Gloucester, N. J. This, too, was a Delaware corporation, with its business activities in New Jersey.

"(4) In December, 1917, a consolidation agreement was entered into between the three corporations above named, the Pusey & Jones Company, the Pennsylvania Shipbuilding Company, and the New Jersey Shipbuilding Company, merging the latter two corporations into the Pusey & Jones Company as a consolidated corporation. The agreement provided: 'The location of the principal office of the said corporation in the state of Delaware is in the city of Wilmington.' The consolidation agreement also contained similar provisions to those above stated covering the redemption of stock, and also provided that the corporation might 'have one or more offices in addition to the principal office in Delaware.'

"(5) The consolidated corporation adopted the by-laws of the old Pusey & Jones Company, which provided that the principal office of the corporation in Delaware should be in the city of Wilmington; that the seal should have inscribed on it the words 'The Pusey & Jones Company, Incorporated, Jan. 28, 1879, Wilmington, Delaware'; that the stockholders' meeting should be held in Wilmington, and that regular meetings of the directors should be held at the office of the company at Wilmington, or at such other place as might be fixed by the directors. The seal in use by the corporation is in the form stated.

"(6) The consolidated corporation had three plants, the old Pusey & Jones plant at Wilmington, consisting of a shipyard and manufacturing establishment, the shipyard of the Pennsylvania Company at Gloucester, N. J., and that of the New Jersey Company at the same place. The latter shipyards were new, being in process of construction when said Hannevig acquired the corporations owning the same. These shipyards had, however, contracts for the construction of large vessels, acquired after said Hannevig obtained control. The Pusey & Jones Company, before the consolidation, had also made contracts for the building of 14 ships. These contracts had been made with or through Hannevig, who charged commission thereon.

"(7) On August 3, 1917, and prior to said consolidation, the government, through the United States Shipping Board Emergency Fleet Corporation, requisitioned all the ships in process of construction and the contracts for their construction which had been made by the three corporations above mentioned. The Fleet Corporation undertook to finance the operation, and in May, 1918—after the consolidation—made a loan of $5,000,000 to the new Pusey & Jones Company, under an agreement which provided, among other things, that the moneys advanced should be deposited in the name of the Fleet Corporation in a bank in Philadelphia; that the Fleet Corporation should have a representative on the board of directors of the consolidated company, who should be elected its treasurer; and that the treasurer should have control of the disbursement of all the funds of the company at the three yards. The agreement further provided that all written notices should be addressed to the company at Wilmington, or should be delivered to an executive officer. As a result of the above arrangements, the work proceeded and the ships involved in the transactions with the Emergency Fleet Corporation were finally completed; the last one being delivered in October, 1920. During the whole period from August, 1917, to October, 1920, substantially all the work at the three

yards was for the Fleet Corporation and consisted in the building of ships; little being done in the machinery portion of the Wilmington plant.

"(8) When the programme of shipbuilding for the Emergency Fleet Corporation was completed in October, 1920, the two yards belonging to the Pusey & Jones Company at Gloucester, N. J., were shut down, and they have remained shut down ever since, only such force being maintained as necessary to protect the property and to gather and dispose of the scrap material; the only business at such yards being the gathering and disposition of such material.

"(9) The capital invested in the Gloucester yards was more than tyice the amount invested in the plants in Wilmington, and the ships constructed in the Gloucester yards from August, 1917, to August, 1920, cost over $38,000,000, as compared with a cost of less than $13,000,000 for the ships constructed in the Wilmington yard. The employees in the Gloucester yards numbered approximately 8,000, while the employees in the Wilmington yard were less than half that number. The Gloucester yards were much larger than the Wilmington yard.

"(10) In August, 1918, the directors of the Pusey & Jones Company voted to separate the operations of the Wilmington plant and the Gloucester plants. They also passed a resolution providing that contracts for the building of vessels should be signed by the president, and that other contracts involving liability above a stated amount should have the signatures of two officers. none of whom at such time resided or had their office in Delaware, although Mr. Coxe, who resided and had his office in Wilmington, later became vice president and general manager. It had previously been voted that checks on bank accounts should have the signatures of two officers. none of whom at that time had a residence or office in Delaware. These requirements were made at the instance of the Emergency Fleet Corporation.

"(11) On March 11, 1918, the Pusey & Jones Company opened a deposit account with the National Bank of North America in Philadelphia, and made the above arrangement as to the signatures upon checks drawn upon such account.

"(12) Said Hannevig, who had acquired all the stock of the original Pusey & Jones Company, and likewise controlled the consolidated corporation, was elected president of the former in May, 1916, and continued to hold such office until the consolidation. He was president of the consolidated corporation from the time of its organization until his bankruptcy in February, 1921.

"(13) At no time were the accounts of the New Jersey plants kept in Delaware, and after the consolidation the business of the corporation in that state consisted of the operation of the Wilmington plant and the keeping of its accounts, which accounts were reported to Gloucester, where the principal bookkeeping office of the corporation was located. The situation was, however, somewhat altered on or about January 1, 1921. Reports of the business done at all the plants were made to Mr. Hannevig in New York.

"(14) In December, 1918, Chester N. Farr, a resident of Philadelphia, was appointed secretary of the Pusey & Jones Company, and he now holds that position. His office has been in Philadelphia.

"(15) Said Christoffer Hannevig, who owned the stock of the Pusey & Jones Company, also operated a private bank at 139 Broadway, New York City, under the name of Hannevig & Co. He had also incorporated a company under the name of Hannevig, Inc., which was engaged in ship brokerage and similar business. Said Hannevig became embarrassed and returned to Norway in April, 1921, where he has since remained. Bankruptcy proceedings were brought against him in the Southern district of New York in February, 1921, and also against Hannevig, Inc., in which proceedings Henry A. Wise was appointed one of the receivers in bankruptcy.

"(16) The estates of Christoffer Hannevig and Hannevig, Inc., together own all the stock of the consolidated Pusey & Jones Company, amounting to $15,000,000, excepting 20 qualifying shares. Such stock constitutes the principal asset of said two estates.

"(17) The receivers of Christoffer Hannevig and Hannevig, Inc., demanded the resignations of Christoffer Hannevig as president and of the various direc-

tors and officers of the Pusey & Jones Company, and by agreement with the principal creditors of said corporation and the principal pledgees of its stock a new board of directors was elected, consisting of Henry A. Wise, of New York, Hartwell Cabell, of New York, George Weems Williams, of Baltimore, Md., Laurence Leonard, of Philadelphia, Pa. and William G. Coxe, of Wilmington, Del.

"(18) The proposed selection of directors and the arrangement relating thereto was submitted to the United States District Court for the Southern District of New York, which on March 22, 1921, made an order approving the same. The new board of directors appointed an executive committee—having all the powers of the board when the board was not in session—consisting of said Wise, Cabell, and Williams, with said Wise as chairman. No president was elected in place of said Hannevig.

"(19) At the time of the election of the new board of directors and prior thereto the Pusey & Jones Company had a claim against the Emergency Fleet Corporation for some $14,000,000, subject to offsets of some $7,000,000. This claim was in litigation in the District of Columbia, Messrs. Rounds, Schurman & Dwight, of New York City, and McKenney & Flannery, of Washington, being the counsel for the company. This was one of the principal assets of the company. It also owned, as already stated, the plants at Gloucester and at Wilmington. The former plants were adapted only to shipbuilding.

"(20) Said Hannevig resided in New York City and had his office at No. 139 Broadway. He was not a practical shipbuilder or engineer, and the immediate work of building the ships, the hiring of the men, and the purchasing of material was conducted at Gloucester, N. J., and at Wilmington, Del., by various representatives, who spent their time at those places. He was in Norway most of 1917 and during six or eight months in 1918 and 1919.

"(21) Said Hannevig selected the board of directors of the Pusey & Jones Company and dominated the appointment by the board of the principal officers and managers, with the exception of those which were dictated by the Fleet Corporation. He furnished money—large sums at times—to the company, procured contracts for the building of ships, and caused the company to execute them, being himself in some cases the nominal contracting party with it. In the later years he endeavored to get bonds for the fulfillment of the contracts which the company desired to execute. He also took steps looking toward the sale of some of the plants of the company, employed the lawyers in the various litigations in which the company was engaged, and discussed matters with them. From time to time the officers of the company came to New York and consulted him at his office No. 139 Broadway. Among those who consulted him was Mr. Coxe, the vice president and general manager.

"(22) The only plant of the Pusey & Jones Company which continued in operation after October, 1920, was the Wilmington plant, where the company was engaged in the business of manufacturing paper-making machinery and employed about 450 men, as compared with some 3,500 men at the height of the shipbuilding operations there. It also built two ferryboats and a coastwise vessel after the government work was completed. This business continued after said date and is still being carried on. During the period beginning January 1, 1921, the company had on hand work to the approximate amount of $2,300,000. On account of this work it collected during the period stated approximately $1,100,000 cash and $200,000 in notes, and made a profit of approximately $38,000. The Wilmington plant has been reconstructed and is well equipped for its business. The business at Wilmington from September, 1920, up to the institution of these bankruptcy proceedings, was under the immediate direction of Mr. Coxe, the vice president and general manager. After their appointment the executive committee visited Wilmington and told Mr. Coxe to continue as before until they directed otherwise.

"(23) Since January 1, 1921, all the manufacturing business which the Pusey & Jones Company has carried on has been at Wilmington. All that has been done at Gloucester has been to guard the property and dispose of the scrap. The labor at the Wilmington plant has been engaged and paid there; materials have been purchased and paid for there; correspond-

ence has taken place from there; the sale department has been located there; the principal bank account has been there, and the books of account covering the Wilmington operations, and also including capital entries, have been kept there, although the books covering both Gloucester and Wilmington operations have been retained at Gloucester.

"(24) The treasurer of the Pusey & Jones Company, from January 1, 1921, to date, has been Laurence Leonard, the nominee of the Fleet Corporation, who resides in Philadelphia. He has had his principal office in Gloucester, but has visited Wilmington about three days a week for the purpose of signing checks.

"(25) Since the appointment of the new executive committee all its meetings have been held in New York City, except in one case, when it was held in Washington. All the new directors' meetings were also held in New York, and the same was substantially true of the old board, although a few meetings were held in Wilmington and Philadelphia.

"(26) The Pusey & Jones Company at no time had an office or office furniture in the city or state of New York, and at no time has its name been displayed on any office, except that for a period in 1917, the office door of Hannevig, Inc., bore words 'Hannevig, Inc., representing,' followed by the names of a number of concerns, among which was the Pusey & Jones Company. The Pusey & Jones Company never owned any property in the state of New York, except that at one time it had a bank account with Brown Bros. & Co. and at another time with the Empire Trust Company. It has, however, had no bank accounts in New York City, or elsewhere in the state of New York, since May, 1920. It has never had a telephone address, or its name in the telephone book in New York City, nor in the city directory. It has never paid taxes in New York City, or in New York state. It has never had any force of employees in New York.

"(27) Various disputes with the Fleet Corporation arose, and in August, 1920, an action was brought in the Supreme Court of the District of Columbia in the matter. The bill in equity, verified by the managing director of the Pusey & Jones Company, stated that it was a Delaware corporation "having its main executive office in the city of Wilmington in said state." Similar statements were made in the papers in two other cases.

"(28) Income tax reports of the Pusey & Jones Company have been filed in the district of New Jersey. Contracts requiring the signature of the president of the corporation were signed by Mr. Hannevig in New York. All questions as to the sale of any of the plants were referred to Mr. Hannevig in New York.

"(29) Some of the stationery used at the Wilmington plant has borne the following inscription:

" 'The Pusey & Jones Company.

| | |
|---|---|
| " 'Established 1843. | Cable Address |
| " '[Trade-Mark.] | "Pussyjones, Wilmington." |
| " 'Executive Department | |
| " 'Wilmington, Delaware, U. S. A.' | |

"Other stationery has been in the same form, except that instead of the words 'Executive Department' have appeared the words, 'Treasury Department,' 'Sales Department,' 'Production Department,' 'Engineering Department,' 'Purchasing Department,' 'Employment Department.'

"The stationery used at Gloucester was engraved as follows:

" 'The Pusey & Jones Company,

" 'Pennsylvania and New Jersey Yards,

" 'Gloucester City, N. J.

| | |
|---|---|
| " 'Successors to | Cable Address: "Glosco." |
| " 'Pennsylvania Shipbuilding Co. | |
| " 'New Jersey Shipbuilding Co. | |
| " 'Gloucester City, N. J.' | |

"(30) For many years the Pusey & Jones Company has advertised its business in various trade papers, and has continued to do so during the last six months, and in such advertising has been designated as of Wilmington, Del.

"(31) On June 9, 1921, Willard Salisbury and Charles B. Evans of Wilmington were appointed receivers in equity of the Pusey & Jones Company by the District Court of the United States for the District of Delaware, and upon the return of a rule to show cause were continued as such receivers pending the action in which they were appointed, which had been brought by one Hanssen, claiming to be a creditor of the Pusey & Jones Company to the extent of $650,000, and such receivers immediately took possession of the Wilmington property and have since operated it.

"Upon the foregoing facts the question to be determined is this: Where was the principal place of business of the Pusey & Jones Company during the six months, or the greater portion thereof, preceding the bankruptcy proceedings? The location of a corporation, as prescribed by its charter, or as fixed by its certificate of incorporation, involves a legal conception. Corporate domicile may be far from corporate activities. The location of the greatest corporation may be largely a matter of registration and designation.

"The principal place of business of a corporation, on the other hand, involves a practical conception. Where does the corporation principally carry on its business? Or, as said by some of the courts, where does it transact the principal part of its principal business? But this does not mean that the principal place of business of a producing corporation is necessarily at its mine or manufactory, or, if it have several mines or manufactories, at the largest plant. The real center of the whole enterprise may be at a separate point. Thus I accept it as the rule that, where a corporation has plants in two different states and an office in a third state, from which its operations are directly managed and controlled, such office will constitute the principal place of business of the corporation within the meaning of the bankruptcy statute.

"But the principal place of business of a corporation must be a real place of business, a real center of activities; must be where it holds itself out as transacting some part of the business for which it was organized. What constitutes a real place of business depends upon many facts and circumstances, but the idea of physical presence must always be regarded. A mere paper corporation can have no principal place of business as distinguished from its chartered location. The activities of an insignificant corporation may be so small and irregular that slight transactions will establish its headquarters. Other cases will be more difficult, and it is hard to state a positive rule. But, stated negatively, the following proposition must be true: A large corporation, engaged in the manufacture of important articles, employing many workmen, and well known throughout the country, cannot be said to have a real place of business, much more its principal place of business, where it has no office or establishment, where it has no employees, and where it does not hold itself out as transacting business at all.

"Now, applying these principles to the present case, I cannot find warrant for holding that the principal place of business of the Pusey & Jones Company was ever in New York. It had no office in New York, no employees there, and the new corporation, at least, never held itself out as doing business there. A person desirous of transacting business with it, and not familiar with its internal affairs, would have had no means of locating it in New York. It is perfectly true that where Mr. Hannevig was was the place where the ultimate control of the corporation resided. He was its sole stockholder and president, and, either directly or indirectly through the directors, could have done about what he pleased with it. He might have caused the establishment of executive offices in New York; might have taken over the immediate and direct management of the plants; might, undoubtedly, have made New York the principal place of business of the corporation. But apparently he did not choose to do these things. He used his own offices in New York for attending to the broader affairs of the company and for the directors' meetings. But I do not think that such use made those offices the principal place of business

of the corporation. Many of the matters attended to there were rather the exercise of incidental corporate powers than the transaction of business.

"In respect to the situation during the six months preceding the bankruptcy proceedings: I cannot find that Mr. Wise or the executive committee exercised any more direct or immediate control over the affairs of the corporation than Mr. Hannevig had done, and it seems to me that it would be to ignore all practical conceptions of the phrase 'principal place of business' to hold, as I have been requested to, that the principal place of business of this corporation during the greater part of such time was in Mr. Wise's office. If, then, the principal place of business of the Pusey & Jones Company was not in New York, where was it? It is indisputable that prior to the consolidation it was in Wilmington. After the consolidation, the development of the Gloucester yards and the carrying into full operation of the government shipbuilding plans, I think that it was shifted to Gloucester. Gloucester seems to have been the headquarters of the operations for the government. But when the shipbuilding programme was completed I think that the principal place of business shifted back to Wilmington and that it has been there ever since.

"The only place where during the six months preceding the bankruptcy proceedings the corporation engaged in any of the productive activities for which it was chartered was Wilmington, and it carried on a substantial and important business there, notwithstanding it was small in comparison with its previous undertakings. Of course, I appreciate that a corporation which has several plants does not change its principal place of business by temporarily shutting down one and operating another to unusual limits. But there is no such case here. Apparently the Gloucester plant was a development of the war, and there is nothing to indicate whether it will ever be reopened. In such a case the bankruptcy law, which concerns itself only with the location of the principal place of business within a short and definite period, looks, in my opinion, at the present fact, and not at history. If in fact the principal place of business of this corporation were in Wilmington during the period in question—and I find that it was—it is of no particular importance whether it had always been there, or whether it had shifted to Gloucester and back again.

"For these reasons I find and hold that the principal place of business of the Pusey & Jones Company, the alleged bankrupt, for the period of six months preceding these bankruptcy proceedings, was in Wilmington in the state of Delaware. And, reaching this conclusion, I am constrained to recommend that the adjudications in bankruptcy made in these proceedings be set aside, and that such proceedings be dismissed."

Charles H. Tuttle and Saul S. Myers, both of New York City, for appellants.

William H. Button, of New York City, and John P. Nields and William G. Mahaffy, both of Wilmington, Del., for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). Section 2 (1) of the Bankruptcy Act confers upon the District Courts of the United States jurisdiction to "adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their respective territorial jurisdictions for the preceding six months, or of the greater proportion thereof. * * * * " The six months here relevant are from January 19, 1921, to July 19, 1921, and may be logically divided into three periods; i. e.: (1) January 19 to March 18; (2) March 18 to June 9; and (3) June 9 to July 19. The third period may be eliminated at once, because during that time the business was conducted by the Delaware receivers at Wilmington, and there can be

no question that during that period the principal place of business was not in New York City, nor in any other part of the Southern district of New York.

The theory upon which appellants urge that the principal place of business of the company was in New York during the first period is that Hannevig controlled the affairs and destiny of the corporation during that time, and that reports were made to him from time to time by the officers of the company. From the report of the special master, it appears that all the manufacturing business during the first period was carried on at Wilmington, and an examination of the testimony shows that during this period there was but one directors' meeting held in the city of New York, and that occurred on February 14, 1921, at the apartment of Hannevig, who was ill at the time. Two days previous—i. e., February 12, 1921—Hannevig had been thrown into bankruptcy. At the meeting referred to one matter was taken up for consideration, and the meeting was then adjourned until February 18, at which time there was not a quorum, and the meeting adjourned sine die.

On February 22, receivers for Hannevig were appointed, and during this period it became plain that not only was Hannevig insolvent, but that a similar fate had been met by various enterprises promoted or acquired by him. As well pointed out by the special master, Hannevig during this period and during the nonrelevant period antecedent thereto had it in his power to make New York the principal place of business of the company; but he did not do so, and, on the contrary, the evidence is overwhelming that the principal place of business was at Wilmington.

Much is made in argument by appellants of the fact that the business of the company was considerably less than that which it had done previously as a result of war-manufacturing activities. There is no merit in this point. Such has been the result in the case of many plants whose manufacturing ability and output have greatly decreased since the war, for one reason or another. It is difficult to understand an argument which fails to recognize that a business which employs 450 men and during the period in question had on hand work to the approximate amount of $2,300,000, collected approximately $1,100,000 cash and $200,000 in notes, and made a profit of approximately $38,-000, with a reconstructed and well-equipped plant, is a substantial and not a petty business.

The statute is not concerned with the size of the business, as compared with its previous and temporary business, but is solely concerned with the principal locus of the business. From the foregoing it will already appear that during more than half of the period under consideration, the principal place of business was unquestionably not in the city of New York.

This might dispose of the case, but, as much is made by appellants of the second period, it is desirable to consider the facts relating thereto. When Hannevig became bankrupt, it was found that his affairs were in a greatly involved state. In addition to his shipbuilding enterprises, he had acquired three marine insurance companies, which he

had brought to disaster. The Pusey & Jones Company had made a contract with Baltimore Dry Docks Company to sell the Gloucester plant for $4,200,000, and Hannevig had appropriated to his own uses the down payment of $75,000. The United States Shipping Board and Pusey & Jones Company were making claims against each other running into millions of dollars.

The stock of the Pusey & Jones Company was the chief asset of Hannevig and Hannevig, Inc. Obviously, it was to the interest of creditors to act unitedly, if possible, in the effort to settle the claims against the United States, the United States Shipping Board, and the Emergency Fleet Corporation.

An agreement, dated March 18, 1921, was entered into by various interests, all the details of which need not be recited; but its principal features were (1) that a new board of directors was to be elected consisting of Mr. Wise, receiver of Hannevig, Mr. Cabell, representing the insurance departments of New York and Pennsylvania, Mr. Williams, representing the Baltimore Dry Docks Company, Mr. Leonard, representing the Shipping Board, and Mr. Coxe, the manager of the Wilmington plant; (2) that there should be an executive committee consisting of Mr. Wise, chairman, Mr. Cabell, and Mr. Williams; (3) that the election of a trustee in bankruptcy of the Hannevig estates was to be postponed and the enforcement of any judgment in favor of Baltimore Dry Docks Company suspended until November 1, 1921; and (4) that the then New York counsel of the company in its government litigations and the local Washington counsel should be continued, subject to the approval of Messrs. Wise and Williams as to negotiations and settlements.

It was plain that the adjudication in bankruptcy against Hannevig could not be stayed without an order of the District Court for the Southern District of New York and, upon application of the parties, that court, under date of March 22, 1921, made an order approving the agreement and staying the adjudication for six months, with leave to apply for adjudication within a shorter time, if so advised.

The novel argument is now advanced that the agreement and order supra created a receivership of Pusey & Jones Company, ancillary to the Hannevig and Hannevig, Inc., receiverships. The mere statement of the proposition carries its own refutation. But the argument is pressed upon the theory that, in some manner unknown to the law, the court's order could change Wilmington as the principal place of business, and create a new principal place of business in New York, because most of the directors and the executive committee lived in New York, and there much discussion and consideration of the questions relative to the litigations took place.

If it be conceded, solely for purposes of argument, that where a corporation is not otherwise doing business, and the only activities are litigation or reorganization, then that the principal place of business is where such affairs are conducted, yet the case at bar does not fall under this classification for two reasons: (1) That part of these litigation or negotiation activities were carried on in Washington, several suits having been brought there; and (2) that the business, inter alia,

286 F.—7

for which the corporation was organized and functioned, was during the six months period continuously carried on in Wilmington.

Numerous cases are cited. We need consider only a few. In the case of In re Guanacevi Tunnel Co., 201 Fed. 316, 119 C. C. A. 554, the bankrupt was an Arizona corporation, which never had any property and never did any mining in Arizona, and, as stated by the court:

"Its activities have been principally connected with the sale of its stock and the payment of its running expenses, and that the only place in which the business has been conducted has been at 55 Liberty street [New York City]."

In the case of In re Matthews Consolidated Slate Co. (D. C.) 144 Fed. 724, and Id., 144 Fed. 737, 75 C. C. A. 603, the facts (described in detail in the opinion of the District Court at pages 729 and 730) show activities in Boston quite different from and much more important and varied than those in New York in the case at bar.

Cases like In re Munger Vehicle Tire Co., 159 Fed. 901, 87 C. C. A. 81, and In re Pennsylvania Consolidated Coal Co. (D. C.) 163 Fed. 579, are so far from applicable to the case at bar that further comment is unnecessary. It is sufficient to support the order below to refer to Roszell Bros. v. Continental Coal Corporation (D. C.) 235 Fed. 343, affirmed 242 Fed. 243, 155 C. C. A. 83; In re Tennessee Construction Co., 207 Fed. 203, affirmed 213 Fed. 33;[1] In re Elmira Steel Co. (D. C.) 109 Fed. 456; In re Monarch Oil Corporation (D. C.) 272 Fed. 524; and Dryden v. Ranger Refining & Pine Line Co. (C. C. A.) 280 Fed. 257.

Finally, it is merely necessary to state that the litigation arising out of the Delaware equity receivership does not in any manner affect the controversy here.

Order affirmed, with costs.

MANTON, Circuit Judge (dissenting). The affairs of Hannevig and Hannevig, Inc., were being administered through receiverships. The principal asset of the Hannevig estates consisted of all the stock of the Pusey & Jones Company. This property consisted of a plant at Gloucester, N. J., another at Wilmington, Del., and a large claim against the United States Shipping Board. The shipbuilding plant at Wilmington was idle, as was the plant at Gloucester, because shipbuilding activities had ceased. It appears, however, that at the Wilmington plant the Pusey & Jones Company was engaged in manufacturing some paper-making machinery. The principal asset of the Pusey & Jones Company consisted of the claim against the Shipping Board amounting to $14,000,000. That this was the principal asset is asserted by the special master in his findings. Negotiations were pending, looking to an adjustment of this claim, and were conducted by Mr. Wise, who was named receiver for the Pusey & Jones Company. On March 18, 1921, an order was entered in the District Court, pursuant to an agreement of that date, which recognized that the administration of the Pusey & Jones Company was necessarily ancillary to the receivership of Hannevig and Hannevig, Inc. In this way, under one general control, the affairs of the Pusey & Jones Company were

[1] 129 C. C. A. 627.

being carried on. It met with the approval of the then stockholders of Hannevig and Hannevig, Inc., and the principal creditors.

The question presented by this appeal is: What was the principal business of the corporation for six months prior to July 19, 1921, when the receiver was appointed for the bankrupt? The manufacturing of paper-making machinery at this time was a small part of its business, considering all of its business in the entirety. This principal business was endeavoring to make an adjustment of this large claim against the Shipping Board. The order of the District Court, which approved the agreement of May 18, 1921, read in part:

"The court, after due deliberation, being of the opinion that the interests of this estate and of all other parties require a prompt, just, and equitable distribution of all claims of the Pusey & Jones Corporation against the United States government and the United States Shipping Board and the Emergency Fleet Corporation, and the court finding further that the plans proposed to be carried out pursuant to said agreement should accomplish such a disposition of said matters."

Thus recognizing the chief duty of the directors of the Pusey & Jones Company. It appears that after this agreement a new board of directors was elected for the Pusey & Jones Company. Thus, by this arrangement, it was determined to try to avoid a receivership of the Pusey & Jones Company. It is clear from the record that the administration of the affairs of this company, in so far as the acts of its board of directors are concerned, were carried on in the city of New York, and the office at which this business was carried on was that of Mr. Wise, who was one of the receivers of Hannevig and Hannevig, Inc., and chairman of the board of directors of the Pusey & Jones Company, as newly constituted. He says he spent 50 per cent. of his time about the affairs of the Pusey & Jones Company. I am convinced that the principal business of this corporation was endeavoring to liquidate its affairs in New York City. The special master found that, since the appointment of the new executive committee, all its meetings have been held in New York City, except in one case, when it was held in Washington; all the new directors' meetings were also held in New York City, and the same is substantially true of the old board, although a few meetings were held in Wilmington and Philadelphia. This applied to the period of six months preceding the bankruptcy. This corporation was in the position of one which has more than one plant situated in different districts, with an office from which supreme direction or control of its property is had. Under these circumstances, the rule is that, if the corporation has an office in a third state, having plants in two different states, and business operations are conducted by management and control from such office, that would constitute its principal place of business within the meaning of the bankruptcy statute. In re Guanacevi Tunnel Co., 201 Fed. 316, 119 C. C. A. 554; In re Matthews Consolidated Slate Co. (D. C.) 144 Fed. 724. In the Matthews Case the court said (144 Fed. at page 738, 75 C. C. A. 604):

"We are of the opinion that when a corporation, operating factories, mills, or mines in various states, has a principal office where business is transacted

of the character of that conducted at the Boston office, * * * rather than a factory, mill, or mine, according to ordinary understanding and speech, as well as according to the intent of Congress, constitutes the 'principal place of business,' within the meaning of the Bankruptcy Act. Not only is this the natural interpretation, but it seems to us the only practical interpretation; for, since there can be but one principal place of business, if regard is paid to the amount of property owned or kept in a particular jurisdiction, or to the amount of product there turned out, or to the number of workmen employed, it might follow that the inquiry would be, which is the largest mine or factory? a question having little relation to the purpose of administering the assets."

To the same effect, see Continental Coal Co. v. Roszelle Bros. (C. C. A.) 242 Fed. 243, 155 C. C. A. 83, and In re Marine Machine & Conveyor Co. (D. C.) 91 Fed. 630.

The principal place of business of a corporation is usually where the general offices or headquarters are located, without regard to the place named in the charter as the principal place of business. The test is where the actual business of the concern is chiefly prosecuted and managed, and where a corporation has several places of business located in different districts, its principal place of business is where the affairs of the corporation are actually managed. To be sure, this is a question of fact, to be determined by the circumstances of each particular case; but the rule is clear. It appears that Hannevig was the principal stockholder of the Pusey & Jones Company; that the Pusey & Jones Company was in fact Hannevig. He conducted all his business and had a place of business in the city of New York, with these plants in New Jersey and Delaware. His financing was done there. When the new board of directors carried on the business under this arrangement with the District Court, they but continued what Hannevig did before them.

It also appears that a voluntary petition in bankruptcy, verified July 25, 1921, was filed, and the corporation, after due authority, petitioned the District Court to be adjudicated a bankrupt in the Southern district of New York. A board of directors of a foreign corporation has power to file a voluntary petition in bankruptcy. In re De Camp Glass Casket Co. (C. C. A.) 272 Fed. 558. And this authority includes the power to declare the place which the board has regarded as the principal place of business and to determine any bona fide and serious question which may arise as to its locality. Such power is inherent and incidental to the power to determine whether the corporation is solvent or not and whether or not it has committed acts of bankruptcy:

"The corporation is presumed to know where it has had its principal place of business, and when the corporation itself files its petition jurisdiction is conferred on the court where filed, subject to a showing in that court that the principal place of business was or had been elsewhere." In re Beiermeister Bros. Co. (D. C.) 208 Fed. 945.

I think the facts require a finding that the principal place of business, as well as the actual management of the corporation, was in the Southern district of New York. Therefore I dissent.